*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |  |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *v.* | ) | *Criminal No. 07-106-P-S* |
| | ) | |
| *FESTUS BABUNDO,* | ) | |
| | ) | |
| *Defendant* | ) | |

***RECOMMENDED DECISION ON MOTION TO SUPPRESS***

Festus Babundo, charged with one count of conspiring to distribute and possess with intent to distribute five grams or more of a mixture or substance containing cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and one count of possession with intent to distribute five grams or more of a mixture or substance containing cocaine base, in violation of 21 U.S.C. § 841(a)(1), *see* Indictment (Docket No. 20), moves to suppress evidence seized by law-enforcement officers from a motel room in Portland, Maine on November 1, 2007, *see generally* Motion To Suppress Evidence, etc. ("Motion") (Docket No. 46). An evidentiary hearing was held before me on February 6, 2008 at which the defendant appeared with counsel and at the conclusion of which counsel for both sides argued orally. I now recommend that the following findings of fact be adopted and that the motion be denied.

**I. Proposed Findings of Fact**

In fall 2007, as part of an ongoing undercover drug-trafficking investigation, the Portland, Maine resident office of the United States Drug Enforcement Agency ("DEA") obtained a federal

warrant for the arrest of Dioseline Gabelino. DEA task force agent Ernest MacVane, who, in the guise of a drug customer, had made prior controlled purchases of cocaine from Gabelino, was assigned the task of making a final controlled cocaine purchase that was to culminate in her arrest.

MacVane, wearing a hidden wire that allowed agents to monitor and record his conversations, met with Gabelino in her car in the Eastern Promenade area of Portland on November 1, 2007. He told Gabelino he had $3,000 to spend. She received a call on her cell phone in MacVane's presence from a person she identified as her source, during which he heard her discuss quantities of cocaine, money and a delivery location. At the conclusion of that call Gabelino instructed MacVane to leave, get in his car and drive to the parking lot of the VIP near former Exit 8 of the Maine Turnpike, where she would meet him, take his money and bring him cocaine after she met with her source. She told MacVane that he would not personally be able to meet her source. MacVane agreed to the arrangement, and he and Gabelino departed the Eastern Promenade in separate vehicles. DEA agents, who were in constant radio contact throughout the operation, discussed this turn of events. MacVane was instructed not to drive to the VIP parking lot but, instead, to take up a position nearby. He drove to the Pinetree Shopping Mall parking lot, about a half block away from the VIP. Meanwhile, other DEA agents in unmarked vehicles – including DEA special agents Paul Wolf and Paul Buchanan – followed Gabelino as she drove to the VIP parking lot. Wolf was serving that day in the capacity of acting supervisor of the Portland resident DEA office, while Buchanan was case agent for the investigation.

Wolf observed Gabelino pull into the VIP parking lot and drive through it to the parking lot of an adjacent Motel 6. It was about 2 or 3 p.m., and the parking lots were quiet. He then observed her exit her vehicle, make a call on her cell phone and walk around outside her car as though waiting for someone. A few minutes later Wolf saw a black male – whom he identified at hearing as the

defendant – walk out of the front door of the Motel 6. The defendant approached Gabelino and either entered or leaned into the passenger side of her vehicle. Buchanan gave the signal to arrest them. Wolf and Buchanan, both of whom were wearing bulletproof vests emblazoned with the word "police," got out of their cars, drew their weapons, identified themselves as police and ordered the defendant not to move, or to stop and get on the ground. The defendant looked at Wolf and began to run toward Riverside Street – a busy four-lane street in front of the motel – throwing some money (bills) in the air as he ran. Wolf, Buchanan and other agents gave chase. By the time Wolf caught up to the defendant, other agents had overtaken him and were in the process of handcuffing his hands behind his back. Agents patted the defendant down. They recovered a $20 bill from his back pocket but no contraband or weapons.

Buchanan identified himself to the defendant. The defendant said he knew what was going on and wanted to cooperate. Buchanan and DEA agent Kate Barnard placed him inside Barnard's vehicle in the VIP parking lot, and Buchanan began to interview him in Barnard's presence, asking biographical questions. The defendant identified himself as Gregory William (which agents later learned was not his real name). He reiterated to Buchanan that he wanted to cooperate, saying something to the effect, "Take me back to my room. Get me out of the parking lot." He warned Buchanan that "he" could probably see the parking lot from the window of the motel, and the "stuff" might already be gone. Buchanan understood the word "he" to mean an accomplice, and "stuff" to mean drugs.[1] Buchanan agreed to take the defendant back to his motel room. Because the defendant was uncomfortable with his hands handcuffed behind his back, Buchanan handcuffed them in the front. Wolf was present for a portion of the initial interview of the defendant. He recalled the defendant

---

[1] Buchanan later learned that the defendant's motel room did not have a view of the parking lot.

saying that he was familiar with how it worked, wanted to work with agents, was going to be cooperative and wanted to further the investigation by a number of means, including going back to his room.

MacVane, who had been kept apprised of developments via radio communication, drove to the VIP parking lot upon learning that Gabelino and a second suspect had been apprehended. He approached Wolf and offered to interview the Motel 6 front-desk clerk to find out what he could about the defendant, whom MacVane learned had identified himself as Gregory William. Wolf agreed. MacVane and DEA task force agent Wayne Clifford went to the Motel 6 front desk and obtained a copy of the motel guest registry, which revealed that Room 222 was registered to a "Gregory W." MacVane and Clifford located Room 222 on the second floor of the motel and set up surveillance in the hallway. MacVane advised participating agents of this development; he in turn was advised via radio communication that the defendant might have an accomplice who might be in the motel room.

Buchanan and DEA task force agent Steven Thibodeau escorted the defendant through a side door up to the second floor of the motel. Approximately ten to fifteen minutes had transpired since the defendant's arrest. Buchanan observed several law-enforcement officers in the hallway, including MacVane. Buchanan, Thibodeau and the defendant stopped about ten or fifteen feet away from the door to Room 222. Thibodeau read the defendant *Miranda* warnings verbatim from a DEA Form 13-A card.[2] The defendant said he understood the warnings, wished to answer questions and wanted to go to his room. Wolf arrived with a key card to Room 222 that he had obtained from the motel front desk. Holding the key card in his hand, he asked the defendant in a normal conversational tone whether he

---

[2] Per *Miranda v. Arizona*, 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-
*(continued on next page)*

freely consented for agents to enter the room. The defendant said yes, he did. Wolf considered this a reconfirmation of the consent to enter the room that he understood the defendant already had given during the interview in the parking lot.

Three or four agents, including MacVane, formed a line to enter the room. Buchanan remained down the hall with the defendant. Wolf swiped the key card through the door lock and opened the door. Agents went in and swept quickly through the room, satisfying themselves that no one else was in there and that there were no weapons visible. From the time MacVane and Clifford first stationed themselves outside Room 222 until the moment when Wolf swiped the key card through the door lock, MacVane had observed no one exit or enter Room 222, and neither he nor Clifford had entered it. Wolf did not enter Room 222 at that point, but instead went back to the motel front desk to arrange use of another motel room as a more private setting for further interview or interrogation of the defendant.

Once agents had accomplished their protective sweep of the room, Buchanan escorted the defendant into it. The room was small, containing only one double bed. Buchanan took the defendant near the bed. The defendant commented, "The stuff's in there," bent over and began to reach toward a black duffel bag near the bed. Buchanan again understood "stuff" to mean drugs. He stopped the defendant, who still was handcuffed with his hands in front of him, lest the bag contain a weapon. Pointing toward an outer pocket of the duffel bag, Buchanan looked at the defendant and inquired: "In here?" The defendant said yes. Buchanan then reached into the pocket and pulled out a plastic bag containing what appeared to be cocaine or cocaine base.

Buchanan asked the defendant if he could search the rest of the bag. The defendant said, "Yes, you can." Buchanan searched the main compartment of the bag, which contained folded clothes, felt a

───────────────────────
79.

5

hard lump in the back pocket of a pair of jeans and pulled out what appeared to be another quantity of cocaine. Buchanan also seized wads of currency totaling about $17,000 from the two front pockets of a second pair of jeans. One of the agents asked MacVane if he had a consent-to-search form. MacVane said he had one in his car and went to retrieve it. The defendant began to tell Buchanan that the guy the agents wanted was "Brown," that the drugs were Brown's and that Brown had disappeared. Buchanan suggested that the defendant place a call to Brown; the defendant said Brown had no phone. Buchanan began to suspect that "Brown" did not exist.

After confirming that the defendant had been read and waived his *Miranda* rights, Wolf moved him to a nearby room on the second floor. MacVane returned with a consent-to-search form. He and Wolf thanked the defendant for his cooperation and his consent to search. The defendant reassured the agents that he wished the search to continue. MacVane presented the defendant with the form, read it aloud and asked if the defendant understood it. The defendant said he did not wish to sign anything. MacVane inquired, "Are you willing to cooperate?" The defendant said: "I'll cooperate. We need to find Brown." MacVane told the defendant that agents would not search anymore until the defendant signed the form. The defendant again refused to sign it. The defendant became agitated, telling Buchanan – who had expressly sought consent to search other bags in Room 222 – that he would not consent to any further search and that he (the defendant) had never said that Buchanan could search the first bag (from which Buchanan had retrieved contraband). Buchanan construed this as a withdrawal of consent. He, Wolf, MacVane and other agents conferred, deciding to suspend the search pending issuance of a federal search warrant. The search was halted. MacVane prepared an application and affidavit in support of a search warrant, which he obtained later that day. The search recommenced pursuant to the warrant, and other items were seized. The defendant eventually conceded, when

pressed by Buchanan and Wolf, that there was no Brown.[3]

The defendant, who is 26 years old, is a native of East Africa. He grew up in West Africa and came to the United States in 2002. As agents learned subsequent to his arrest, his name is Festus Babundo, not Gregory William. The defendant appeared to Buchanan to have average intelligence. He demonstrated no difficulty speaking or understanding English. Buchanan ran an NCIC check that revealed that the defendant had a criminal history in four states – Tennessee, Louisiana, Maine and Virginia – having been convicted on eight charges ranging from a traffic violation to a drug charge and having been arrested on six charges that did not result in a conviction, ranging from a traffic violation to attempted murder. By the defendant's own admission, he is conversant with *Miranda* rights and has filed at least one motion to suppress in connection with prior arrests.

At the time of his arrest on November 1, 2007 the defendant was aware that he was subject to an Immigration and Naturalization Service ("INS") deportation order. He also knew that he was subject to an INS order of supervision issued in Oakdale, Louisiana, that imposed conditions of release that forbade him from traveling outside the State of Tennessee and, therefore, discovery of the fact that he had traveled to Maine could lead to his arrest. He risked journeying to Maine to sell drugs because he was not required to report to the INS until December and therefore thought the

---

[3] The government offered testimony from three DEA agents: MacVane, Wolf and Buchanan. Agents' recollections of events of November 1, 2007 were not consistent in all respects. For example, (i) MacVane recalled that the defendant took a step toward the door of Room 222, as though to enter, when he was brought up to the second floor, while Buchanan did not recall him making such a move, (ii) MacVane testified that he smelled a very strong odor of burnt marijuana upon entering the room, Wolf did not recall whether the room smelled of marijuana or not, and Buchanan said he smelled no such odor when he entered Room 222, (iii) MacVane testified that the defendant entered Room 222 simultaneously with the entry lineup of agents, while Buchanan and Wolf testified that, for the defendant's own safety, he was kept down the hallway with Buchanan while the protective sweep was undertaken, and (iv) MacVane and Buchanan indicated that the defendant was still in Room 222 when the consent-to-search form was presented to him, while Wolf testified he was in the nearby room Wolf had secured to interview him. These and other discrepancies concern immaterial details. Having carefully observed the demeanor of the witnesses, I am satisfied that these conflicts are attributable to the vagaries of human perception and memory rather than to untruthfulness on the part of any of the agents.

transgression would go undetected.[4]

## II.  Discussion

The defendant asserts that he did not consent to a search of Room 222 of the Motel 6 and, alternatively, any consent he gave was not voluntary.  *See* Motion at [2]-[4].  At hearing, his counsel made clear that the defendant seeks to suppress only items seized in accordance with his purported consent, not those seized pursuant to the later-issued search warrant.  His motion therefore targets the cocaine or cocaine base and U.S. currency Buchanan seized from the black duffel bag (including from the pairs of jeans stored in that bag).

The government rejoins that the defendant did indeed consent both to entry into the motel room and to search of the bag from which Buchanan extracted contraband and that, in view of the totality of the circumstances, his consent was voluntary.  *See* Government's Objection to Defendant's Motion To Suppress Evidence, etc. ("Objection") (Docket No. 58) at 6-9.

"Valid consent renders a warrantless search constitutionally permissible, and while consent

---

[4] At hearing, the defendant testified to a starkly different version of the critical events of November 1, 2007 than had the government's witnesses.  He testified that (i) when approached by agents he initially thought they were robbers, which was why he threw money at them, (ii) he was not read *Miranda* rights before he was taken to Room 222, (iii) at no time did anyone seek his permission to enter his motel room, (iv) he never indicated that he was willing to cooperate, (v) when he was taken to Room 222 he saw that the door was open, Buchanan and another agent already were inside the room and Buchanan had already seized drugs from the black duffel bag, and (vi) he never gave consent for search of that bag.  The defendant testified that he was so taken aback upon witnessing the scene in Room 222 that he lied and said the bag and drugs were not his but those of a fictitious individual, Brown.  He stated that, as reflected in his refusal to sign the consent-to-search form, he had no intention to consent to a search because he knew that, if found in possession of drugs, he would be sent to prison and ultimately deported.  He also testified on direct examination that he was intimidated by the agents, as anyone would be.  I find this version of events wholly lacking in credibility.  First, it is at sharp odds with testimony of three DEA agents whom I find to be credible witnesses.  Second, it defies reason that agents who were cautious enough to cease a search and obtain a search warrant would have barged into the defendant's motel room and begun a warrantless search absent any indication of consent.  Third, the defendant has shown repeated willingness to lie when it suits his purposes, including the purpose of extricating himself from a jam.  He acknowledged that he carries a false photo identification card in the name of "Gregory William," has lied about his identity to a number of people for a number of years, has provided false birth dates, and lied to agents on November 1, 2007 about the existence of an alleged accomplice, Brown.  Fourth, as the defendant admitted on cross-examination, when it came to agents' request that he sign a consent-to-search form, he was not intimidated and had no difficulty refusing.  From all that appears, the defendant decided initially to cooperate with agents on November 1, 2007 because he had not been found in possession of contraband and thought he could succeed in attributing the contraband in the motel room to the fictitious Brown.  He apparently had second
*(continued on next page)*

must be voluntary to be valid, there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it." *United States v. Perez-Montañez*, 202 F.3d 434, 438 (1st Cir. 2000). "It is the prosecution's burden to establish, by a preponderance of the evidence, that consent was freely and voluntarily given; there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority." *Id.* (citation and internal quotation marks omitted). "Voluntariness turns on a number of factors, including the person's age, education, experience, intelligence, and knowledge of the right to withhold consent." *United States v. Coraine,* 198 F.3d 306, 309 (1st Cir. 1999) (citation and internal quotation marks omitted). "The court can also consider whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." *Id.* (citations and internal quotation marks omitted). "The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *United States v. Mares*, 428 F.3d 64, 67 (1st Cir. 2005) (citation and internal punctuation omitted). "[C]onsent may be express or inferred from conduct." *United States v. Winston*, 444 F.3d 115, 121 (1st Cir. 2006).

     As a threshold matter, I find that the government has proved by a preponderance of the evidence that the defendant consented both to agents' entry into Room 222 and Buchanan's search of the black duffel bag. As discussed above, I find the defendant's version of events wholly lacking in credibility. At hearing, defense counsel posited that it defied logic that his client would have consented to a search of the motel room knowing full well that, if caught with contraband, he would be jailed and even deported. Defense counsel also suggested that his client had demonstrated truthfulness

---

thoughts about the wisdom of cooperating when the Brown ruse began to collapse.

in admitting on the stand during the hearing that he had lied in various respects. Yet I find the defendant's initial decision to cooperate with agents readily explicable: When arrested, he was not found in possession of contraband, and he hoped via his cooperation to deflect attention from himself to his fictitious accomplice, Brown. What is more, this was not the first time the defendant had been willing to take the risk of incarceration or deportation. He had traveled to Maine in contravention of INS conditions of release because, in his judgment, he was unlikely to get caught. The defendant's truthfulness on the stand was selective: For the most part, he admitted to things that already had become apparent to agents, such as his criminal history, the lie concerning Brown and his false identification as Gregory William.

Consistent with the testimony of DEA agents MacVane, Wolf and Buchanan, I find that (i) within moments of the defendant's arrest, he conveyed a willingness to cooperate, including by taking agents to his motel room, (ii) when the defendant was brought to the second floor of the Motel 6, Thibodeau read him his *Miranda* rights verbatim, and the defendant acknowledged and waived them, expressing willingness to talk to agents, (iii) subsequent to Thibodeau's reading of *Miranda* rights but prior to any entry into Room 222, Wolf reconfirmed that the defendant consented to the agents' entry into his room, and the defendant said he did, (iv) consistent with the defendant's offer to cooperate, he told Buchanan when brought into Room 222 that drugs were in the black duffel bag, reaching toward the bag as if to remove something, (v) after Buchanan stopped the defendant from touching the bag and asked him, "In here?" the defendant said yes, and (vi) Buchanan expressly asked permission to search the rest of the bag, and the defendant said he could.

The defendant therefore gave express consent to the agents' entry of Room 222, implied consent to Buchanan's search of the outer pocket of the duffel bag (from which the initial quantity of

cocaine was extracted) and express consent to search of the remainder of the duffel bag.[5]

The government further succeeds in proving, in view of the totality of the circumstances, that the defendant's consent was voluntarily given. The facts, as I propose they be found, paint a picture not of a suspect coerced or duped into cooperating but rather, of an experienced criminal making calculated decisions. The defendant had been arrested many times before. As he told agents at the outset, he knew what was happening. He possessed average intelligence and had no difficulty communicating in English. Prior to the time he became agitated, his interaction with agents was cordial; agents found him cooperative, and Wolf spoke to him in a normal conversational tone in seeking his consent to enter the motel room. There is no evidence that the defendant was under the influence of drugs, alcohol or medication or otherwise impaired or unusually susceptible. He had been advised by Thibodeau of his *Miranda* rights and, in any event, was familiar with them from past experience. The suggestion that he was intimidated by the agents is belied by his conduct: He had no difficulty declining to memorialize his consent to search in writing.

### III. Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be*

---

[5] At hearing, defense counsel cited *United States Carter*, 985 F.2d 1095, 1097 (D.C. Cir. 1993), for the proposition that a motion such as the defendant's attempt to reach into the black duffel bag represents a withdrawal of consent. *Carter* is distinguishable. The conduct taken to constitute withdrawal of consent in that case was the defendant's snatching away from a detective a brown paper bag that the detective had just pulled out of a tote bag. *See Carter*, 985 F.2d at 1096-97. In this case, the defendant's motion toward the duffel bag was consistent with his earlier offer to cooperate and his statement divulging to Buchanan that drugs were in the bag.

*filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 11th day of February, 2008.

<u>/s/ David M. Cohen</u>
David M. Cohen
United States Magistrate Judge
